IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39975-3-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| A.A.S.-M, [†] | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |
| Respondent. | | |

FEARING, J. — Juvenile A.A.S.-M. appeals his adjudication of first degree assault

on insufficiency of evidence grounds. In doing so, he complains that his trial counsel

performed ineffectively when failing to object to a statement he made, at age 12, to an

arresting officer. We rule that any ineffective performance did not prejudice A.A.S.-M.

Thus, we affirm his conviction.

FACTS

We take the facts from a juvenile court bench trial, labeled a juvenile adjudicatory

---

† To protect the privacy interests of A.A.S.-M, we use initials throughout this
opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title* (Wash. Ct. App.
Aug. 22, 2018) (effective September 1, 2018),
http://www.courts.wa.gov/appellate_trial_courts.

hearing.  We rely primarily on the testimony of the gunshot victim Misael Cruz for the details of the crime.

On June 25, 2023, Hispanic 12-year-old A.A.S.-M. and three other boys entered an alley behind a house in Yakima, while looking for another juvenile, S.R.  A.A.S.-M. opened the gate between the alley and the house, walked through the backyard, ambled onto the porch, and loudly knocked at the door.  A.A.S.-M. had previously visited the home.  An automatic light illuminated the porch.

From inside, an older man, Misael Cruz, peered through the window by the door. He saw someone in a face mask and a black or blue hooded sweatshirt.  Cruz opened the door and informed the masked individual that S.R. was not present.  The veiled person on the porch grew upset, insisting "Yes he is!" before turning to leave.  Rep. of Proc. (RP) at 48.  As he departed, this disguised person lifted his mask.  Cruz recognized him as A.A.S.-M. because A.A.S.-M. had visited his residence two years earlier.

As A.A.S.-M. walked away, Misael Cruz stepped outside, while continuing to assert that S.R. was not present.  A.A.S.-M. returned to the alley behind the house and garage where the three other boys remained.  Cruz, while looking through a trellis surrounding the porch, heard a loud noise and saw three individuals flee through the alley.  Later Cruz noticed a figure he identified as A.A.S.-M. standing near the gate while holding an object.  He speculated that the object was a gun or a knife.  As Cruz turned to

2

reenter his home, gunshots rang out.  Cruz did not see the gun fire.  Cruz suffered a broken rib and punctured lung when one round hit his back.  Other bullets hit the house.

Yakima area law enforcement officers later arrested A.A.S.-M.  Because of a skull fracture and broken nose suffered by A.A.S.-M., an ambulance transported A.A.S.-M. to the hospital.  After A.A.S.-M. entered the emergency room, Yakima Police Officer Kasey Kim informed him he was a suspect in a shooting and read him his *Miranda* rights.  *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); Officer Kim did not provide A.A.S.-M. with legal counsel.  Kim sat in a chair as A.A.S.-M. lay on a gurney.  Kim began to type a report on a laptop computer, while A.A.S.-M. continued to speak.  We assume Kim then typed the comments uttered by A.A.S.-M.

A.A.S.-M. asked Officer Kasey Kim whether he needed to share his side of the story.  Officer Kim said no, but the 12-year-old continued to speak.  At the adjudicatory hearing, Officer Kim testified:

> [OFFICER KIM]: So, once I arrived at the hospital, I started just taking some photos of the injuries.  And then, I asked him if he had his rights read while he was already out in the field and he said he had not.  So, I explained to him that I couldn't ask him any questions, but I was just gonna read him his rights anyway.
> . . . .
> [STATE]: And you told him that you weren't gonna ask him any questions?
> [OFFICER KIM]: Yes.
> [STATE]: Okay.  And then what happened?
> [OFFICER KIM]: So, after that, I just — I sat down in the chair that

3

they have in there and started typing up the report on my laptop.

. . . .

      [STATE]: Okay.  And then what happened?

      [Officer Kim]: And then [A.A.S.-M.] asked me if — well, he wanted to tell me his side or the story or he needed to tell me his side of the story, and I told him no.

. . . .

      [STATE]: Okay.  So, when you read [A.A.S.-M] his rights, including those juvenile warnings that you read—

      [OFFICER KIM]: Mm-hmm.

      [STATE]: —did he appear to understand what you were telling him?

      [OFFICER KIM]: Yes.  So, after I read him, do you understand these rights, he told me that he did.

      [STATE]: Did he ask any questions about follow up or seem uncertain?

      [OFFICER KIM]: No.

      [STATE]: Did he ask for an attorney at that point?

      [OFFICER KIM]: No, he didn't.

      [STATE]: And did you offer him an attorney at that point?

      [OFFICER KIM]: No, I did not.

      [STATE]: Why not?

      [OFFICER KIM]: Because, I wasn't gonna ask him any questions anyway, regarding the investigation that was going on.

RP at 172-76.

During his testimony, Officer Kim explained his reasons for not offering

A.A.S.-M. access to an attorney:

      [STATE]: Okay.  All right.  So, when [A.A.S.-M.] started talking, did you stop him and tell him that you wanted to get him an attorney?

      [OFFICER KIM]: I did not.

      [STATE]: Did you offer him an attorney at that point?

      [OFFICER KIM]: No, I did not.

      [STATE]: Why not?

      [OFFICER KIM]: After reading him his rights, he never asked for

4

one.

> [STATE]: Okay.
> [OFFICER KIM]: So, I didn't think he wanted one.

RP at 177.

A.A.S.-M. volunteered to Officer Kasey Kim that he had left home that day looking for a fight. He also volunteered that he formerly possessed a gun, but his girlfriend now possessed it. Finally, according to Officer Kim, A.A.S.-M. asked Officer Kim to thank the officer who injured him. Defense counsel never objected to the introduction of A.A.S.-M's concession that he sought a fight or that he possessed a firearm under ER 404(b) or RCW 13.40.740.

Law enforcement never recovered a firearm or a facemask. Officers found four shell casings in the alley behind Misael Cruz's home and one casing outside the back gate, near the garage and alley. Cruz survived his gunshot wound after being airlifted to Seattle's Harborview Medical Center.

PROCEDURE

On June 27, 2023, the State of Washington charged A.A.S.-M. with first degree assault and obstructing a law enforcement officer. The juvenile court adjudicatory hearing commenced on August 21, 2023.

During the adjudicatory hearing, A.A.S.-M. admitted to knocking on the back door of Misael Cruz's home on the night of the shooting. Nevertheless, he denied possessing a

gun or wearing a mask. A.A.S.-M. averred that he was leaving Cruz's property when the gunshots began. He marked, on a diagram, his position near the back gate at the time of the shots.

Before rendering its verdict, the juvenile court considered the admissibility of A.A.S.-M.'s statements to Officer Kim. Defense counsel argued that Officer Kim intended to elicit a confession without direct questioning. The juvenile court admitted A.A.S.-M.'s statements at the hospital as evidence while reasoning that Officer Kim had advised A.A.S.-M. of his rights and that A.A.S.-M. had volunteered the information.

The juvenile court found A.A.S.-M. guilty of first degree assault while armed with a firearm and obstructing a law enforcement officer. The court entered findings of fact:

13. Misael Cruz heard noise and looked out at the alley through a hole in the lattice covering the porch. He observed three people take off running down the alley.
14. Misael Cruz saw [A.A.S.-M.] come through his gate and approach him quickly, holding something in both of his hands.
15. Misael Cruz thought it might be a gun or a knife.
16. The way Misael Cruz demonstrated [A.A.S.-M.] holding the object is consistent with someone holding a gun with a hand underneath the butt of the gun and the other hand holding the gun forward.
. . . .
20. Misael Cruz did not actually see a gun fired.
. . . .
28. Based on crime scene investigation, and the totality of the circumstances, law enforcement concluded that the shooter's approximate location was between the car and the garage, outside the gate. Law enforcement reached this conclusion because of the path of the bullets, the bullet strikes, and the spread of bullet casings recovered from the scene.

6

The bullet casings covered an area of the alley the size of a queen or full sized mattress as noted in the diagram prepared by Detective Patrick Schad (Plaintiff's exhibit 79).

CP at 53-55. The juvenile court entered an important conclusion of law, which may be more of a finding of fact:

5. A.A.S.-M.'s statements to Officer Kim regarding his ownership of a gun indicate that he had the ability to access weapons.

CP at 57.

## LAW AND ANALYSIS

On appeal, A.A.S.-M. challenges his conviction for first degree assault as being supported by insufficient evidence. A.A.S.-M.'s assignment of error 2 reads:

Issue 2: The trial court's finding of guilt was not supported by sufficient evidence when the state only proved A.A.S.-M.'s presence at the shooting and the court impermissibly inferred guilt from A.A.S-M's lack of cooperation.

Br. of Appellant at 3.

In challenging the sufficiency of evidence, A.A.S.-M. asserts that his trial counsel performed ineffectively when failing to object to the introduction of statements A.A.S.-M. uttered in the hospital to Officer Kasey Kim. Thus, A.A.S.-M. asks this court to ignore his statements given to Officer Kim when assessing the sufficiency of evidence.

In response to A.A.S.-M.'s appeal, the State notes that A.A.S.-M. assigned no

error to any of the findings of fact. The State asks that we treat those findings as verities.

The State cross-appeals the trial court's third and final sentence in finding of fact Number 28 because no evidence supported this finding. A.A.S.-M. concedes this cross-appeal error. We do not consider the cross-appeal important to the disposition of the appeal and do not resolve it.

Findings of Fact

We first determine whether to adopt the findings of fact wholesale. The State observes that A.A.S.-M. failed to comply with RAP 10.3 because he failed to assign error to any of the trial court's findings of fact. According to the State, those findings, without searching the underlying evidence, justify the conviction for first degree assault.

Under RAP 10.3(a)(4), an appellant's brief must include:

> A separate concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error.

In turn, RAP 10.3(g) declares:

> The appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto.

Despite the literal meaning of RAP 10.3(a)(4) and (g), when a party's brief identifies the part of the decision being challenged, courts may overlook the failure to specifically assign error to findings. *In re Disciplinary Proceeding of Conteh*, 175 Wn.2d

134, 144, 284 P.3d 724 (2012).  RAP 1.2(a) encourages the court to address the merits of an appeal rather than dismissing it due to procedural noncompliance.  RAP 1.2(c) further allows the court to waive procedural rules when necessary to serve the ends of justice.  Modern procedural rules are intended to ensure that courts decide appeals on their merits rather than dismissed on technical grounds.  *Mine Holding Trust v. Pavlish*, 32 Wn. App .2d 727, 738, 559 P.3d 517 (2024).

A.A.S.-M.'s assignment of error 2 assumes that the State only proved that he was present at the shooting.  This assumption challenges the veracity of findings of fact 14, 15, and 16, which proclaim that A.A.S.-M. approached the back gate of Misael Cruz's property, held an object in his hand that could be a gun, and A.A.S.-M.'s holding of the object was consistent with holding a gun.  Thus, we conclude that A.A.S.-M., although indirectly and imperfectly, assigns error to the three findings.  The State shows no prejudice by our allowing a challenge to the three findings.  Therefore, we proceed as if A.A.S.-M. assigned error to findings 14, 15, and 16.

Ineffective Assistance of Counsel

A.A.S.-M. argues that his trial counsel's failure to object to the admission of the statements he made to Officer Kasey Kim, while he lay on a gurney with a fractured skull, violated his constitutional right to effective legal representation.  He emphasizes that, during this interview, he admitted to earlier gun possession.  He argues that ER

9

404(b) disallowed evidence of possession of a firearm, a prior bad act. He also argues

that RCW 13.40.740 demanded exclusion of the concession because Officer Kim failed

to afford him access to an attorney. In turn, he complains the State used the evidence to

show he carried a gun on the night of the shooting.

To establish ineffective assistance of counsel, a defendant must demonstrate that

(1) counsel's performance was deficient and, (2) the deficiency resulted in prejudice.

*State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Performance is

deficient if it falls below an objective standard of reasonableness. *State v. Stenson*, 132

Wn.2d 668, 705, 940 P.2d 1239 (1997). Reasonable conduct for an attorney includes

carrying out the duty to research the relevant law. *State v. Kyllo*, 166 Wn.2d 856, 862,

215 P.3d 177 (2009). Prejudice is shown by establishing a "reasonable probability" that,

but for counsel's deficient performance, the outcome of the proceeding would have been

different. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d

674 (1984); *State v. McFarland*, 127 Wn.2d 322, 337 (1995).

A.A.S.-M. does not meet his burden of showing prejudice. Misael Cruz testified

that A.A.S.-M. was the only person in his yard when the shooting occurred and that he

got a clear look at the boy before retreating inside. A.A.S.-M. stood between the car and

garage—the spot where investigating officers concluded the shooter opened fire. Cruz

also saw A.A.S.-M. holding an object consistent with pointing a firearm, with one hand

supporting the butt and the other hand aimed forward. A.A.S.-M.'s having earlier owned

or possessed a gun lacked criticality to the conviction.

Sufficiency of Evidence

Following a bench trial, this court limits its review to determining whether

substantial evidence supports the findings of fact and, if so, whether those findings

support the conclusions of law. *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182

(2014). Substantial evidence is sufficient evidence to persuade a fair-minded person of

the truth of the asserted premise. *State v. Homan*, 181 Wn.2d at 105-06 (2014). When

reviewing a claim of insufficiency, the appellant necessarily admits the truth of the

State's evidence and all reasonable inferences arising from it. *State v. Salinas*, 119

Wn.2d 192, 201, 829 P.2d 1068 (1992). We defer to the fact finder in resolving

conflicting evidence and making credibility determinations. *State v. Camarillo*, 115

Wn.2d 60, 71, 794 P.2d 850 (1990).

Under RCW 9A.36.011, an individual commits first degree assault if, with the

intent to inflict great bodily harm, he assaults another person using a firearm or other

deadly weapon.

A.A.S.-M. challenges the following factual findings made by the court when

adjudicating him guilty:

13. Misael Cruz heard noise and looked out at the alley through a

hole in the lattice covering the porch. He observed three people take off running down the alley.

14. Misael Cruz saw [A.A.S.-M.] come through his gate and approach him quickly, holding something in both of his hands.

15. Misael Cruz thought it might be a gun or a knife.

16. The way Misael Cruz demonstrated [A.A.S.-M.] holding the object is consistent with someone holding a gun with a hand underneath the butt of the gun and the other hand holding the gun forward.

CP at 54.

This testimony of Misael Cruz amply supported each of these findings. In turn, these findings support a conviction for assaulting one with a firearm with the intent to inflict great bodily harm.

No. 39975-3-III
*State v A.A.S.-M.*

CONCLUSION

We affirm the conviction of A.A.S.-M. for first degree assault.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Cooney, J.

_____
Staab, A.C.J.

13



A.A.S.-M. after arrest

FEARING, J. (concurring) —

Arrest of A.A.S.-M.

The arrest of A.A.S.-M. reminds me of the arrest of Joseph Zamora, also a Latinx residing in central Washington, described in *State v. Zamora*, 199 Wn.2d 698, 512 P.3d 512 (2022).

On the night of June 25, 2023, Yakima area law enforcement received a report of the shooting of Misael Cruz and a description of the clothing worn by a possible juvenile shooting suspect. Dispatch notified law enforcement officers that the suspect, A.A.S.-M.,

"possibly wore a gun on his waist band." Ex. 34, at 01:25 to 01:32. As A.A.S.-M. walked through a post office parking lot near his home, Union Gap Police Officer Tyler McPherson, while patrolling in his police car, spotted him. A.A.S.-M. sprinted into traffic. Officer McPherson rolled down his window and ordered him to stop.

Officer Tyler McPherson followed A.A.S.-M. into a gas station parking lot, exited his vehicle, aimed his weapon at A.A.S.-M., and ordered him to the ground. A.A.S.-M. complied. He sat down on the pavement and leaned against the side of a convenience store. McPherson instructed A.A.S.-M. to hold his hands in the air. A.A.S.-M. held up his hands but still below his shoulders where McPherson thought he might still reach for his waistband. He held nothing in his hands. McPherson ordered A.A.S.-M. again to place his hands in the air. A.A.S.-M. said a prayer instead.

Yakima Police Officer Mike Gordon arrived to assist Officer Tyler McPherson. Officer Gordon wore a body camera that recorded the arrest. The State displayed the recording at the adjudication hearing.

Officer Mike Gordon instructed A.A.S.-M. to lay on the ground. Thus, Gordon told A.A.S.-M. to lay on the pavement, while McPherson told A.A.S.-M. to put his hands high. At trial, McPherson conceded the difficulty in obeying two contrary instructions. A.A.S.-M. did not obey Gordon.

Officer Mike Gordon and Officer Tyler McPherson approached A.A.S.-M. with guns drawn. Gordon sought to control A.A.S.-M.'s left arm, while McPherson worked to

immobilize A.A.S.-M.'s right arm. Officer Gordon, weighing more than 200 pounds, stepped on and pinned A.A.S.-M.'s left shin bone. At that time, 12-year-old A.A.S.-M. was then 5'3" and weighed 110 pounds. A.A.S.-M. put his hands together at his waistband. Officer McPherson wondered if A.A.S.-M. intended to grab a weapon. The video shows that A.A.S.-M. moved his chest and arms forward when Gordon stepped on his shin.

A.A.S.-M. cussed at the two officers and refused to relinquish his limbs. The officers placed A.A.S.-M. face down on the ground. More officers arrived to assist in taking A.A.S.-M. into custody. In total, ten officers attended to the arrest of A.A.S.-M. One officer was Yakima Police Department Sergeant Travis Shephard.

Sergeant Travis Sheppard assumed A.A.S.-M. possessed a gun, although the sergeant never saw a firearm. Also, when Shephard approached A.A.S.-M., Officers Mike Gordon and Kasey Kim controlled A.A.S.-M.'s hands. Sheppard pinned A.A.S.-M.'s head to the pavement, while he delivered three knee strikes to his skull. Four other officers then surrounded A.A.S.-M. After pausing, Sheppard executed three more blows. At trial, Sheppard claimed A.A.S.-M. continued to fight, but the video does not confirm any fighting when Sheppard struck A.A.S.-M.'s head with the first of seven blows. Following another pause, Sergeant Sheppard delivered a final knee strike to the preteen's cranium as A.A.S.-M. screamed, "please, I'm sorry, I'm sorry." Ex. at 02:10. A.A.S.-M.

3

sustained a fractured skull and broken nose. Travis Sheppard, at no time, saw a gun on

A.A.S.-M. At trial, Sheppard refused to concede he broke A.A.S.-M.'s skull or nose.

During trial, Sergeant Travis Sheppard, who fractured A.A.S.-M.'s skull and broke

his nose with seven knee strikes, described policing as "a team sport." Rep. of Proc. at

256. He added that he would have preferred using a blood chokehold but lamented that

"the State took that from us." RP at 236. Officer Derek Chauvin employed the

chokehold when killing George Floyd. Talia Shadwell, *George Floyd 'cried for his mum'*

*as police officer used 'blood choke' that killed him*, MIRROR (Mar. 30, 2021), available at

https://www.mirror.co.uk/news/us-news/george-floyd-cried-mum-police-23823848.

A.A.S.-M. Hospital Statement

Unlike the majority, I would address A.A.S.-M.'s assertion that his trial counsel

breached the standard of care when failing to object to the admission of any statement

made by A.A.S.-M. at the hospital. Practitioners could benefit by an analysis of this

contention particularly because of the State' misperception of RCW 13.40.740. This

juvenile statute precluded use of A.A.S.-M.'s statement at trial because the detaining

officer failed to afford the juvenile access to an attorney. In conclusion, the defense

counsel's failure to object fell below the standard.

All persons have constitutional rights when subjected to custodial interrogation,

and the State cannot admit an accused's statements unless law enforcement engages in

procedural safeguards effective to secure the privilege against self-incrimination.

4

No. 39975-3-III
*State v. A.A.S.-M*

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); U.S.

CONST. AMENDS. V, VI, XIV; CONST. ART. 1, §§ 3, 9. When law enforcement interrogates

an individual in police custody, the officer must inform the detainee of his or her right to

remain silent, that anything he or she says may be used against him or her in court, that

he or she has a right to an attorney, and that the government will provide an attorney if he

or she cannot afford one. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

RCW 13.40.740 provides additional safeguards for children in Washington by

requiring a consultation with counsel before a court may consider any waiver of *Miranda*

rights knowing, intelligent, and voluntary. The statute declares:

> Except as provided in subsection (4) of this section, *law enforcement shall provide a juvenile with access to an attorney for consultation*, *which may be provided* in person, *by telephone*, or by videoconference, *before the juvenile waives any constitutional rights if a law enforcement officer*:
> (a) Questions a juvenile during a custodial interrogation;
> (b) *Detains a juvenile based on probable cause of involvement in criminal activity*; or
> (c) Requests that the juvenile provide consent to an evidentiary search of the juvenile or the juvenile's property, dwellings, or vehicles under the juvenile's control.
> (2) The consultation required by subsection (1) of this section may not be waived.
> (3) Statements made by a juvenile after the juvenile is contacted by a law enforcement officer in a manner described under subsection (1) of this section are not admissible in a juvenile offender or adult criminal court proceeding, unless:
> . . . .
> (c) *The statement was made spontaneously*.

5

RCW 13.40.740(1) (emphasis added). Because of the importance of this right to counsel, the child may not waive the right. RCW 13.40.740(2). The State may use the statement against the juvenile if made spontaneously. RCW 13.40.740(3)(c).

To further this statutory mandate, the Office of Public Defense (OPD) established the Youth Access to Counsel (YAC) program to ensure that Washington youth receive fair treatment in law enforcement interactions and fully understand their constitutional rights in high-stress situations. The detaining officer may contact an attorney 24/7 by calling 1-877-JPUB-DEF (1-877-578-2333). Wash. St. Off. Pub. Def., OPD Youth Access to Counsel Program: 2024 Update, https://opd.wa.gov/sites/default/files/2025-02/000161OPD%20YAC%20One%202024%20FebFINAL.pdf. *OPD Youth Access to Counsel Program: 2024 Update, Washington State Office of Public Defense.* The OPD also provides a resource titled *Tips for Officers on How to Use the Hotline* to guide law enforcement in properly utilizing the YAC line. https://opd.wa.gov/sites/default/files/2023-08/00918-2022_YAC.pdf.

Officer Kasey Kim violated RCW 13.40.740(1)(b) when he failed to provide A.A.S.-M. with access to counsel in the hospital. Because Officer Kim told A.A.S.-M. he was a suspect in a crime and Kim read A.A.S.-M. his *Miranda* rights, Kim showed he intended to detain A.A.S.-M. *Miranda v. Arizona*, 384 U.S. 436(1996). The State concedes Officer Kim held A.A.S.-M. in custody based on probable cause.

6

The State argues that Officer Kasey Kim did not interrogate A.A.S.-M. such that Kim did not violate RCW 13.40.740. But the duty to provide access to counsel applies regardless of whether the officer questions the youth. RCW 13.40.740(1)(b) demands this access whenever the officer detains the juvenile based on probable cause.

The State claims A.A.S.-M.'s statements were spontaneous and thus excepted from suppression by reason of RCW 13.40.740(3)(c). The statute does not define "spontaneous." Nor does any case define the term for purposes of the statute. The State cites two cases that hold that the State may introduce into evidence an adult's incriminating statement made in custody without the *Miranda* rights if the statement was voluntary and spontaneous. *Miranda v. Arizona*, 384 U.S. 436(1966). *State v. Ortiz*, 104 Wn.2d 479, 484, 706 P.2d 1069 (1985); *State v. Peerson*, 62 Wn. App. 755, 771-74, 816 P.2d 43 (1991). None of those cases define "spontaneous."

A.A.S.-M. relies on decisions addressing the excited utterance exception to the hearsay rule found in ER 803(a)(2). Under the rule, a statement qualifies as an excited utterance or spontaneous statement if the statement was made while the declarant was under the stress of excitement caused by an event or condition and the statement relates to the event or condition. *State v. Thomas*, 150 Wn.2d 821, 83 P.3d 970 (2004); *State v. Davis*, 141 Wn.2d 798, 843, 10 P.3d 977 (2000). According to *State v. Hardy*, 133 Wn.2d 701, 714, 946 P.2d 1175 (1997), a person utters a spontaneous statement "while

7

under the influence of external physical shock before the declarant has time to calm down enough to make a calculated statement based on self-interest."

When a statute does not define a word found therein, a court may employ a lay dictionary to assist in defining the term. *In re Forfeiture of One 1970 Chevrolet Chevelle*, 166 Wn.2d 834, 839, 215 P.3d 166 (2009). Dictionary.com defines "spontaneous" as "coming or resulting from a natural impulse or tendency; without effort or premeditation; natural and unconstrained; unplanned," or "given to acting upon sudden impulses." https://www.dictionary.com/browse/spontaneous (last visited Jul 11, 2025). The dictionary definition fits A.A.S.-M.'s employment of ER 803(a)(2), not the State's definition of being unprompted.

A.A.S.-M. uttered his statements after an ambulance ride, having his injuries photographed, and receiving *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436(1966). He spoke while he reflected on recent events, not about the injuries suffered. A.A.S.-M.'s confession to ownership of a gun was not spontaneous.

Defense counsel's failure to object to the admission of A.A.S.-M.'s statements to Officer Kim fell below an objective standard of reasonableness under the circumstances. *See State v. Stenson*, 132 Wn.2d 668, 705 (1997). Failing to object to the statements served no legitimate purpose. The legislative history of RCW 13.40.740 highlights that youth often do not fully understand the consequences of waiving their rights, that police encounters can be influenced by racism, and that minority youth may feel pressured to

8

No. 39975-3-III
*State v. A.A.S.-M*

comply with officers.  H.B. Rep. on H.B. 1140, at 5, 67th Leg., Reg. Sess. (Wash. 2021),

https://lawfilesext.leg.wa.gov/biennium/2021-

22/Pdf/Bill%20Reports/House/1140%20HBR%20APP%2021.pdf?q=20250808104612

The fact that 12-year-old A.A.S.-M. would feel compelled to "share his side of the

story" while on a hospital gurney, then purportedly thanked the officer who fractured his

skull with seven knee strikes, illustrates why our legislature deemed such statements

inadmissible.  RP at 175.

_____

Fearing, J.